**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:12-CV-23**

SONIA M. GRAHAM                                                    PLAINTIFF,

v.

CITY OF HOPKINSVILLE, KENTUCKY, *et al.*                    DEFENDANTS.

## MEMORANDUM OPINION

This matter is before the Court upon Defendants' three motions for summary judgment.

(1)      Defendant Hopkinsville/Christian County Emergency Communications Center ("ECC") has filed a Motion for Summary Judgment. (DN 35.) Plaintiff has responded, (DN 52), and the ECC has replied. (DN 61.)

(2)      Those named individually as Defendants ("Individual Defendants") have filed a separate Motion for Summary Judgment. (DN 36.) Plaintiff has responded, (DN 57), and the Individual Defendants have replied. (DN 62.)

(3)      Defendants Christian County, Kentucky ("Christian County"), and Sheriff Livy Leavell, Jr. ("Sheriff Leavell"), have renewed their Motion to Dismiss and also move for summary judgment on Plaintiff's remaining claims. (DN 41.) Plaintiff has responded, (DN 56), and Defendants have replied. (DN 58.)

These matters are now ripe for adjudication. For the following reasons, Defendants' Motions are GRANTED.

**BACKGROUND**

Plaintiff Sonia Graham ("Graham" or "Plaintiff") was hired as a telecommunications officer for the ECC in July of 2009. Sometime in the fall of 2009, Graham began experiencing difficulty on her shift, due in large part to conflicts with her supervisor, Stephanie Noel. Graham frequently questioned Noel regarding shift procedures that Graham believed were at odds with her recent training. While Graham viewed these questions as clarifying correct procedure, Noel viewed them as undermining her authority. Graham, who considers herself an optimistic and "happy-go-lucky" person, would also take issue with her co-workers' negative comments about fellow dispatchers or those who called in requesting assistance. Tensions escalated, sometimes leading to heated exchanges with Noel, after which Graham would call Assistant Director Joann Cowherd requesting to go home. After one such call, Cowherd came to the office to counsel Noel and Graham. The counseling session ended with the two women agreeing to move forward with a "clean slate."

Unfortunately, Graham's struggles with her shift continued. Fellow dispatchers began treating her coldly. When Graham questioned two of her co-workers, they informed her that they thought she was a "know-it-all" and that they had heard she had complained about the way they performed their dispatching duties. During this time period, Graham also learned that Noel and another dispatcher had started a rumor that Graham had gone to a strip club with some of the police officers, which embarrassed Graham. Graham began staying after her shift ended to converse with the midnight shift. Members of that shift began asking her why her shift did not include her and seemed to dislike her. Sometime after this, Noel accused Graham of staying after to complain about her to the midnight shift, which she viewed as insubordinate. After a

2

particularly heated incident between the two that ended with both Noel and Graham raising their voices and Graham again requesting to go home, Graham was moved to a different shift.

Graham began working under Captain Danny Comperry in February 2010, and her problems at the ECC abated for a period of time. However, sometime in March, Graham began having conflicts with a senior dispatcher, Charis Ford. During a two- or three-week period from the end of April through beginning of May, Graham met with Sheriff Livy Leavell, an ECC board member, on three separate occasions to inform him about her experiences. The meetings involved her supervisors' and co-workers' breaches of protocol, favoritism, and Graham's mistreatment.

In May, tensions with Ford escalated. On May 1, 2010, while left in charge, Ford requested that Graham go home to change because her skirt violated the ECC's dress code. Graham changed and returned to work. Later that same evening, Graham reported witnessing what she believed to be inappropriate conduct between Ford and a police officer. Thereafter, Ford was unfriendly to Graham. Graham recalls one incident during this time period where Ford referred to black youths as "little niglets," which Graham found highly offensive and inappropriate. Also in mid-May, Graham overheard a conversation between Ford and Cowherd in which they were discussing what to order for dinner. During the exchange, Ford asked Cowherd, a "known lesbian," if she had "eaten a Mexican lately." Being the only Hispanic employee at the ECC, Graham was offended by this remark. Additionally, a series of conflicts took place between Ford and Graham regarding calls placed and proper procedure, and Graham spoke with both ECC Director Judy Toombs and Supervisor Comperry about the conflicts. Comperry held a meeting for all shift personnel in which he reminded dispatchers to be professional over the radio and set aside any personal issues they may have with a co-worker.

During this meeting, Ford indicated she disliked Graham because Graham was a "liar." Following the meeting, Graham turned in a complaint to Director Toombs detailing her conflicts with Ford.

A few days later, on May 27, 2010, Graham was fired from the ECC. Graham filed a grievance with the ECC Board. On July 9, 2010, the Board reinstated Graham indicating that, although it agreed that Graham had "clearly violated ECC personnel policies on several occasions," the Board hoped that all ECC staff could move forward with a clean slate. The letter, signed by Hopkinsville Police Department Chief Guy Howie, also indicated that Graham would be placed on probation for six months following her reinstatement and reminded Graham to "make a concerted effort to cooperate" with her fellow workers, be respectful of her supervisors, and follow all ECC personnel policies.

When Graham resumed work, she was placed on a new shift under supervisor Sarah Drennan. However, Graham indicates she continued to be ignored by co-workers. Graham began keeping a diary of each time she was ignored and any violation of policy or procedure that she observed. Graham's diary contains a number of instances where she overheard fellow employees use profanity, make sexually suggestive comments to one another, or use racially insensitive terminology. The majority of these incidents did not directly involve Graham and she did not complain about them. The most egregious incident involves fellow dispatcher Mike Deluga, who answered Supervisor Drennan's inquiry about the need to purchase more toilet paper by responding that, because he did not have a "blood hole," he was unaware of the availability of toilet paper. Graham and the other women who were present complained, and Deluga was suspended for two days with a warning that similar infractions could result in his termination.

4

Also during this time period, Graham was late for work three times between November 5, 2010, and December 9, 2010. On one of those occasions, a deputy sheriff who was dispatched to Graham's home to check on her discovered that she had been asleep. Also during this time, Graham's supervisor documented instances of insubordination, once involving protocol for handling a call and once involving not filling out required paperwork for a shift change. After learning of these infractions and the presence of "explicit" photographs on Graham's Facebook page, the ECC Board voted to terminate Graham on December 29, 2010. This time, Graham's request to file a grievance was denied.

On February 16, 2012, Graham brought suit against the ECC, her supervisors and co-workers,[1] the City of Hopkinsville, Christian County, and ECC board members.[2] Graham seeks compensatory and punitive damages for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e *et seq.*), the Kentucky Civil Rights Act ("KCRA") (K.R.S. § 344.010 *et seq.*), 42 U.S.C. § 1983 ("§ 1983"), and 42 U.S.C. § 1985 ("§ 1985"). Graham also advances state law claims for retaliation, wrongful termination, breach of contract, intentional infliction of emotional distress, defamation, criminal malfeasance, and the criminal falsification of business records. Graham has since voluntarily dismissed both the City of Hopkinsville and Christian County. In its September 28, 2012, Memorandum Opinion and Order, this Court also granted Sheriff Leavell's Motion to Dismiss Graham's claims against him for the falsification of business records (Count VI) and malfeasance (Count X). The remaining Defendants now move for summary judgment on Graham's remaining claims against them.

---

[1] Specifically, Graham has filed suit against ECC Director Judy Toombs, Assistant Director Joann Cowherd, and Supervisors Toni Majors, Sarah Drennan, Kathee Delaney, and Charis Ford.
[2] Graham lists as defendants: Hopkinsville Police Chief Guy Howie, Sheriff Livy Leavell, Fagan Pace, and Chris Patterson, both in their individual and official capacities as members of the ECC Board.

**STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

**DISCUSSION**

**I.    <u>Count I: Discrimination on the Basis of Race</u>**

Graham asserts claims for racial discrimination under both Title VII and the KCRA. Because "the general purpose of the [KCRA] is to provide a means for implementing within the

state the policies embodied in Title VII," federal courts may look to federal law under Title VII in construing the KCRA. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 n.5 (6th Cir. 1997).

### A.   Individual Defendants[3]

The Individual Defendants have moved for summary judgment on Graham's racial discrimination claim, noting that they may not be held personally liable under either Title VII or the KCRA because they are not Graham's "employer." *Id.* at 405. Graham concedes this point. Therefore, the Individual Defendants' Motion[4] is granted in this respect.

### B.   ECC

Because the Court has granted summary judgment for the Individual Defendants, the foregoing analysis applies solely to the ECC. Title VII makes it unlawful for an employer "to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In a Title VII action, the burden is on the plaintiff to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

A plaintiff may prove her case through direct or circumstantial evidence of discrimination. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995); *Henry v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 162 F. Supp. 2d 794, 799 (S.D. Ohio 2000). No direct evidence of discrimination exists in the present case. "In the absence of direct evidence . . . Title VII claims are subject to the familiar burden-shifting framework set

---

[3] The Court uses the term "Individual Defendants" to encompass both the individual employees at the ECC and the ECC board members.

[4] Although Sheriff Livy Leavell moves separately from the other defendants sued in their individual capacities, this disposition applies with equal weight to Sheriff Leavell.

forth in *McDonnell* . . . as subsequently modified in *Texas Department of Community Affairs v. Burdine*, [450 U.S. 248 (1981)]." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009). Under *McDonnell*, after the plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. 411 U.S. at 802. If the employer demonstrates such a reason, the burden shifts back to the plaintiff to show that the stated reason is in fact pretext for unlawful discrimination. *Id.* at 804. The burden of persuasion remains with the plaintiff at all times. *Risch*, 581 F.3d at 391 (citing *Burdine*, 450 U.S. at 253).

To establish a prima facie case of discrimination, a plaintiff must demonstrate that she (1) is a member of a protected class, (2) was qualified for her job, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated non-protected employees. *See*, *e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). The plaintiff must at least establish an inference of discrimination. *Id.* (citing *Burdine*, 450 U.S. at 253).

The ECC first argues that Graham has not demonstrated that she is a member of a protected class, in other words, that she has not proven she is Hispanic. In support of this argument, the ECC notes that, although Graham considers herself Mexican, she was born in the United States, has never resided in Mexico, and listed her race as white on an employment application. However, the ECC also adds that "plaintiff has not produced any proof that the individuals she is accusing of discriminating against her because of her ethnicity" actually knew her ethnicity, which seems to address causation more than whether Graham is Hispanic. Because Graham's discrimination claims can be otherwise disposed of, the Court declines to rule on this issue.

Graham's claim for race discrimination fails because the ECC has articulated non-discriminatory reasons for her termination and Graham has not proven pretext. Specifically, the ECC contends that Graham was fired because she could not get along with her co-workers and supervisors, failed to abide by ECC policies, and arrived late for work three times while she was on probation. In response, Graham contends the ECC's proffered reasons are pretext. In order to establish pretext "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) (citing *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1109 (8th Cir. 1994)), overruled on other grounds by *Geiger v. Tower Auto.*, 579 F .3d 614 (6th Cir. 2009). The plaintiff must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the action], or (3) that they were insufficient to motivate [the action]" in order to establish pretext. *Id.* at 1084 (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). Graham admits that the events cited as justification for her termination occurred, and focuses on the role such events played in her termination.

Graham first argues that she was never approached about the offenses for which she was ultimately terminated and the reasons for her second termination were "of dubious severity." This, Graham contends, "suggests that the re-termination was in fact a pretext for other reasons." Over several pages, Graham's response takes issue with the reasons given for Graham's ultimate termination, arguing that they are "inadequate to justify a cause." However, Graham's disagreement with the ECC's decision to terminate her and her subjective belief that her offenses were "of dubious severity," without more, are insufficient to show pretext. As this Court has previously noted:

It is not enough to simply show that the employer's decision was wrong or mistaken. *See Boze v. Gen. Elec. Co.*, 2009 WL 2485394, *9 (W.D. Ky. Aug. 11, 2009). The issue before the Court is whether the employer's decision was an illegally discriminatory one, not whether the employer made the best decision to discipline or terminate a plaintiff, or even whether the employer's decision was reasonable. *Stein v. Nat'l City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991) ("It is not the function of courts to judge the wisdom of particular business policies. . ."); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990). Thus, without more, Plaintiff's argument that Defendant lacked cause to terminate him is legally insufficient to show that Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff's employment was a pretext for retaliation. *See generally*, *Manzer*, 29 F.3d at 1084 ("'just cause' arguments . . . must not be allowed to creep into an employment discrimination lawsuit.").

*Todd v. Unilever United States, Inc.*, 2011 WL 6206111, *6 (W.D. Ky. Dec. 14, 2011), appeal dismissed (Apr. 5, 2012). Like the plaintiff in *Todd*, Graham has failed to offer additional evidence that would suggest the ECC's motives were discriminatory.

Graham makes two final attempts to support her contention that her termination was based on discriminatory animus. First, she points out that an administrative law judge for the Kentucky Unemployment Insurance commission determined that Graham's tardiness was an insufficient basis for termination. However, "[b]oth Kentucky state and federal courts have held that a Kentucky Unemployment Insurance Commission's decision awarding a plaintiff unemployment benefits does not have issue-preclusive effect upon Title VII claims." *Id.* at *5 (collecting cases) (internal quotation marks omitted). As the Sixth Circuit has noted, "turning an unemployment hearing into a forum for thorough exploration of such issues would defeat the purpose of providing fast, cheap resolution of unemployment claims." *Hicks v. Floyd Cnty. Bd. of Educ.*, 99 F. App'x 603, 605 (6th Cir. 2004). Graham's second argument points to racially insensitive remarks made by her co-workers and supervisors. However, though Graham was present and overheard such remarks, none were directed at her specifically. Graham points to Charis Ford's "Eat a Mexican" joke to Joann Cowherd, noting that because she is Hispanic "it is understandable that she was greatly offended." However, Title VII was "not designed to purge

10

the workplace of vulgarity," *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 827 (6th Cir. 1997), and although such incidents may demonstrate immaturity and a lack of professionalism, the Court fails to see how these isolated incidents demonstrate that Graham's conflicts preceding her termination or her termination itself were in any way related to her Hispanic ethnicity. Thus, Defendants are entitled to summary judgment on Graham's Title VII claim for discrimination on the basis of race.

## II.     Count II: Sexual Harassment

Count II of Graham's amended complaint asserts claims under both Title VII and the KCRA[5] for sexual harassment through a hostile work environment. Again, the Individual Defendants note that they may not be held personally liable under either Title VII or the KCRA because they are not Graham's "employer," *Wathen*, 115 F.3d at 405, which Graham again concedes. Therefore, the Individual Defendants' Motion is granted in this respect as well, and the Court addresses Graham's claim only as it pertains to the ECC.

Sexual harassment that creates a hostile work environment violates the prohibition against gender discrimination in the conditions or privileges of employment. 42 U.S.C. § 2000e–2(a)(1). To make out a prima facie case of sex discrimination based on allegations of a hostile work environment, a plaintiff must show that (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006). A hostile work environment exists "[w]hen the workplace is permeated with

---

[5] The Kentucky Supreme Court has adopted the federal framework for interpreting a hostile work environment claim under the KCRA. *Ammerman v. Bd. of Educ. of Nicholas Cnty.*, 30 S.W.3d 793, 797-98 (Ky. 2000).

discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To be sufficiently "severe or pervasive," (1) the conduct must be enough to create an environment that a reasonable person would find hostile or abusive, and (2) a plaintiff must subjectively regard the environment as abusive. *Id.* Courts look to the following factors to determine whether an objectively hostile work environment exists: the frequency of the discriminatory conduct; its severity; whether it is physically threatening, humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 678-79 (6th Cir. 2000) (citing *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 789-90 (6th Cir. 2000)).

The Court finds that Graham has failed to meet the objective "severe or pervasive" standard for a hostile work environment. Graham contends that sexual harassment was "pervasive" at the ECC. In support of that statement, Graham cites to a list that serves as a sort of table of contents of her affidavit submitted in response to Defendants' motions. This table of contents indicates that thirteen paragraphs in Graham's 157-paragraph affidavit address sexual harassment. The relevant portions recount jokes involving sex—almost all of which were overheard by, and not directed at, Graham—and a number of inappropriate comments by fellow dispatcher, Mike Deluga,[6] including the disturbing incident involving the use of the term "blood hole." (*See* Ex. 4 ¶¶ 8, 100, 103, 106, 109, 111, 113, & 133, DN 52-5.) Graham also notes that "deputies and officers would come in and get mini massages on their shoulders or rubbed on their upper leg or on their head and neck", but does not contend that she was asked to participate in the massages. (*Id.* ¶ 73.) Graham recounts two events (aside from overhearing Ford's joke involving Mexican food) in which she was the subject of sexual harassment. First, she learned

---

[6] Graham has not named Deluga as a defendant.

from a fellow dispatcher that Supervisor Noel and another dispatcher were spreading a rumor that Graham had attended a strip club with officers and stripped for them on a pole. (*Id.* ¶ 38.) Fellow employees asked Graham whether the rumor was true, which embarrassed Graham. (*Id.*) Second, after Graham came into work while off duty wearing a "denim shirt and t-shirt," an unnamed dispatcher commented that her "shirt [sic] was so short you could see [her] 'short and curlies' and that no one knew why [Graham] had to 'come in dressed like a slut.'" (*Id.* ¶ 70.) Graham did not hear this remark at the time but was "told later."

Even when taken as true, these instances do not amount to a pervasive course of discriminatory conduct. First, although sex-based comments and conduct need not be aimed at Graham to constitute actionable harassment, the fact that few were directed at Graham is somewhat indicative of their lack of severity. *Black*, 104 F.3d at 826. "Although the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was 'not designed to purge the workplace of vulgarity.'" *Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). Secondly, the incidents in which Graham was directly involved were infrequent and, although inappropriate, do not rise to such a level that they created a hostile environment. *See Johnson v. Rumsfeld*, 238 Fed. App'x 105, 108 (6th Cir. 2007) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (noting that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to a hostile work environment.") (internal quotation marks omitted); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (three alleged instances of discrimination insufficient to rise to level of pervasive discriminatory conduct). For these reasons, the Court finds that Graham has failed to establish a hostile work environment and summary judgment on this issue is warranted.

### III.   <u>Count III: Retaliation</u>

Count III of Graham's amended complaint alleges that the Defendants acted in violation of Ky. Rev. Stat. § 344.280, the KCRA's anti-retaliation provision. This Court has previously held that, unlike Title VII, Ky. Rev. Stat. § 344.280 allows claims against individual persons. *See*, *e.g.*, *Adams v. United Parcel Serv.*, 2006 WL 1687699, *3 (W.D. Ky. Jun. 19, 2006). Otherwise, courts interpret the KCRA consistent with relevant federal case law. *See Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004).

To establish a claim for retaliation, Graham must show that (1) she engaged in activity protected by Title VII or the KCRA; (2) this exercise of protected rights was known to Defendants; (3) Defendants thereafter took a materially adverse employment action against Graham, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000) (citations omitted).

Defendants first argue that Graham cannot show she was engaged in protected activity. "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII." *Id.* at 579. "Opposing" conduct protected by Title VII includes "complaining to anyone" "about alleged discrimination against oneself or others." *Id.* at 579, 580. Defendants argue that Graham merely complained of procedural and safety breaches of protocol and personality conflicts with her co-workers and supervisors, which does not qualify as "protected activity." Graham argues that the personality conflicts of which she complained "may" have been "brought upon in part by her Hispanic ethnicity" or the fact that she "was not a lesbian as several of her supervisors were."

Thus, she argues, her complaints about personality conflicts were essentially complaints of discrimination. First, Graham offers no support for her allegations, and the Court can find none in the record. Second, any claim under Title VII or the KCRA based on Graham's heterosexual orientation is not actionable. *See Vickers*, 453 F.3d at 762 (Title VII) *and Roberson v. Brightpoint Servs., LLC*, 2008 WL 793636, *4 (W.D. Ky. Mar. 24, 2008) (KCRA). Finally, even if Graham's complaints about Ford's Mexican food joke and her meetings with Sheriff Leavell could be construed as protected activities, these events took place before her initial termination, and Graham does not point to any other protected activities in which she engaged after her reinstatement.

Even if Graham could satisfy her prima facie burden, however, Defendants would still be entitled to summary judgment because, as discussed above, Graham has not provided any evidence that the ECC's justification for her termination is pretext. Graham argues that the reasons are pretext for retaliation because Sarah Drennan, who complained about the same policy violations, is still employed with the ECC. Because Drennan is "unmistakably white" and Graham is "unmistakably Hispanic," Graham argues that she was terminated in retaliation for her complaints because she was Hispanic. This argument is merely a reformulation of Graham's race discrimination claim, which the Court has already found lacks merit. Furthermore, the Court disagrees that there is no material difference between Drennan and Graham other than their ethnicities. Graham has pointed to no evidence that Drennan, a supervisor, had the same disciplinary issues that Graham had. Thus, the women are not similarly situated in all material respects.

Defendants are entitled to summary judgment on Graham's retaliation claim.

**IV.**     <u>**Count IV: 42 U.S.C. § 1983**</u>

Count IV of Graham's Amended Complaint incorporates her Title VII claims and seeks remedy under 42 U.S.C. § 1983. The Sixth Circuit has held, "Title VII provides the exclusive remedy when the only § 1983 cause of action is based on a violation of Title VII." *Day v. Wayne Cnty. Bd. of Auditors*, 749 F.2d 1199, 1204 (6th Cir. 1984). However, *Day* recognizes "an employee may sue her public employer under both Title VII and § 1983 when the § 1983 violation rests on a claim of infringement of rights guaranteed by the Constitution." *Id.* at 1205.

In her response, Graham does not specifically mention any federally protected right on which her § 1983 claim is predicated, and does not directly respond to Defendants' argument under *Day*. Though it is unclear, Graham perhaps attempts to implicate her equal protection rights under the Fourteenth Amendment with a passing reference to discrimination on the basis of race. However, the Court has already determined that Graham has not shown any race discrimination on the part of Defendants. Thus, Defendants are entitled to summary judgment on Graham's § 1983 claim.

**V.**     <u>**Count V: Wrongful Termination, Denial of Due Process, and Breach of Contract**</u>

Count V of Graham's Amended Complaint alleges that Defendant's decision to terminate Graham was in violation of her employment agreement with the ECC and violated the ECC's Employment Manual. Graham also argues that the Board denied her due process by disallowing her to file a grievance following her second termination.

**A.**     **Wrongful Termination / Breach of Contract**

Kentucky is at-will employment state, meaning that an employer can discharge an employee for any reason, including a morally indefensible one. *Grzyb v. Evans*, 700 S.W.2d 399,

400 (Ky. 1985). "Absent a clear statement not to terminate without cause, the assumption is that the parties intended to enter into an ordinary employment relationship, terminable at the will of either party." *McNutt v. Mediplex of Ky., Inc.*, 836 F. Supp. 419, 421 (W.D. Ky. 1993) (citing *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky. 1983)). The employer must state its clear intention to modify the at-will relationship into a for-cause relationship. *Hines v. Elf Atochem N. Am., Inc.*, 813 F. Supp. 550 (W.D. Ky. 1993); *Noel v. Elk Brand Mfg.*, 53 S.W.3d 95, 99 (Ky. Ct. App. 2000). There is no support for Graham's argument that her employment was not terminable at will. Her employment application noted that, if hired, she would be an at-will employee and that her status "may not be changed by any written document or by conduct unless such change is *specifically acknowledged* in writing by an authorized executive of this organization." (Graham's Application for Employment, 4, DN 35-7) (emphasis added).

Graham offers two arguments to the contrary, neither of which are grounded in the record or relevant case law. First, through a series of hypothetical questions that, frankly, make her arguments difficult to understand, Graham argues the ECC's employee manual ensured that her termination "was governed by a set of rules, and as long as she played by those rules, her job was safe when she is [sic] terminated for cause[.]" However, the Kentucky Supreme Court has stated that an employee's at-will status is unchanged by an employee handbook when the employee handbook has a disclaimer stating that it is not a contract. *Noel*, 53 S.W.3d at 98-99; *Nork v. Fetter Printing Co.*, 738 S.W.2d 824, 826-27 (Ky. Ct. App. 1987). See also *Wathen*, 115 F.3d at 407–08 ("Under Kentucky law, a clear disclaimer defeats an employee's breach of contract claim"). Here, the ECC's Employee Manual specifically states, in bold lettering: "These policies are not an employment contract. Unless a statute indicates otherwise, employment at the ECC is at-will . . . [T]he only way the ECC may modify at-will employment would be to execute a

written contract signed by the employee and an ECC official authorized to contract on behalf of the ECC." (DN 35-8.) Second, Graham contends that her reinstatement letter constitutes a written contract modifying her status as an at-will employee to that of a "probationary employee." As a "probationary employee," Graham contends, she was no longer an at-will employee. However, there is nothing in the letter reinstating Graham that suggests she was no longer an at-will employee. The letter indicates that Graham would be reinstated to her previous position and that her probationary status would be extended for an additional six months. (DN 36-7.) Graham notes that the letter never indicates that she is an at-will employee or specifically restores her to the status of at-will employee. Rather than bolster her argument, the letter's failure to mention at-will status does the opposite, as Kentucky law requires a clear statement of the intention to modify the at-will relationship.[7] Finally, Graham's argument that, by extending her probation period by six months, the ECC was contracting to give her additional protections is nonsensical and completely misconstrues the function of a probation period.

For the above reasons, summary judgment is warranted on Graham's claim under a breach of contract theory.

**B.     Due Process**

Also under Count V of her Amended Complaint, Graham alleges that ECC Board members denied her due process rights of appeal by declining to accept a grievance following her second termination. The Fourteenth Amendment protects citizens from state deprivation of life, liberty, or property without due process of law. U.S. Const. amend. XIV. Protected property interests do not emanate from the Constitution, but rather are "created and defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents*

---

[7] Moreover, ECC policy required that any modification to at-will status be *specifically acknowledged* in writing.

*v. Roth*, 408 U.S. 564, 577 (1972). When a litigant asserts a governmental official has violated his procedural due process rights, a court employs a two-step analysis to measure the claim: determine if the litigant possessed a legitimate property interest and then ask what procedures were necessary to protect the interest. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004) (citing *Johnston–Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990)). If Graham did not have a property interest in her position, she is not entitled to any pre-deprivation process. *Curby v. Archon*, 216 F.3d 549, 553 (6th Cir. 2000) (citing *Lake Mich. Coll. Fed'n of Teachers v. Lake Mich. Cmty. Coll.*, 518 F.2d 1091, 1094 (6th Cir. 1975)).

Kentucky law controls the nature of the employment relationship between Plaintiff and the Parks Department. *See Bishop v. Wood*, 426 U.S. 341, 344 (1976). Again, in the absence of a clear and specific agreement to the contrary, employment for an indefinite period of time is terminable at will by either party. *Shah*, 655 S.W.2d at 491. "An at-will employee is subject to dismissal at any time and without cause; consequently, an at-will employee cannot effectively claim a protectable property interest in his or her job." *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997).

Graham argues that, because the Employee Manual contains a grievance procedure that she was allowed to utilize after her first termination, she had a protectable property interest in filing a grievance after her second termination. Although it outlines a grievance procedure, the Manual also indicates the policies therein are intended to provide "guidance" on potential personnel problems and "are not an employment contract. Unless a statute indicates otherwise, employment at the ECC is at-will." (DN 35-8.) The Manual, while setting in place a grievance process, specifically disavows its status as a contract, stating that it merely provides guidelines. Therefore, as there is no evidence of a clear and specific agreement to the contrary, the Court

finds that, as an at-will employee, Graham had no protectable property interest in her employment at ECC. Therefore, her procedural due process claim fails as a matter of law. *See Bailey*, 106 F.3d at 141.

### VI.     Count VI: Falsification of Business Records

Next, Graham alleges a claim for "Falsification of Business Records" based on Defendants' alleged violations of state criminal statute, Ky. Rev. Stat. § 517.050. As this Court noted in a previous opinion, civil remedies for violations of *state* criminal statutes are generally available in Kentucky through Ky. Rev. Stat. § 446.070, which provides, "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." The Kentucky Court of Appeals has recently noted that this statute was enacted to codify common law negligence per se. *Sparks v. Henson*, 2012 WL 5463877, *8 (Ky. Ct. App. Nov. 9, 2012). In other words, § 446.070 gives a right of action "only to persons suffering an injury as a direct and proximate result [of a violation]; and then only for such damages as they may actually sustain." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 800 (Ky. 2004). Furthermore, "[i]t follows that if the defendant was not in the class of persons whose conduct was intended to be regulated by the statute, the defendant could not violate the statute and KRS 446.070 simply would not apply." *Davidson v. Am. Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000).

The Court was unable to find a single case where a court applied § 517.050 in the manner that Graham requests the Court apply it here.[8] Even assuming Kentucky courts would allow

---

[8] K.R.S § 517.050 has been held to give rise to a wrongful discharge claim where an employee is discharged for refusing to falsify business records in violation of the statute. *See Ne. Health Mgmt., Inc. v. Cotton*, 56 S.W.3d 440, 447 (Ky. Ct. App. 2001). However, Graham does allege she was asked to falsify records and subsequently discharged; rather, she seeks to recover damages for Defendants' alleged falsification of documents in her personnel file. (Pl.'s Am. Compl., 12, DN 7.)

maintaining such a cause of action here, Graham has not pointed to any facts that would support a claim under § 517.050.[9] First, it is unclear that a performance write-up in an employee's personnel file would qualify as a "business record" under the statute, defined as "any writing or article kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity." *See* Ky. Rev. Stat. § 517.010(2). Second, other than her bare allegations, Graham points to no evidence from which a reasonable jury could conclude entries in her personnel file were made with the intent to defraud, as required under the statute. Therefore, Defendants are entitled to summary judgment on Graham's claim based on § 517.050.

## VII.   <u>Count VII: Intentional Infliction of Emotional Distress</u>

In Count VII, Graham contends the Defendants' actions constitute outrage under Kentucky law. A prima facie case of intentional infliction of emotional distress, or outrage, requires that a plaintiff show: (1) that the wrongdoer's conduct was intentional or reckless; (2) that the conduct was outrageous and intolerable and offends against the generally accepted standards of decency and morality; (3) a causal connection between the wrongdoer's conduct and the emotional distress; and (4) that the emotional distress was severe. *Stringer*, 151 S.W.3d at 788 (citing *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990)).

---

[9] In full, § 517.050 states:

A person is guilty of falsifying business records when, with intent to defraud, he:

(a) Makes or causes a false entry to be made in the business records of an enterprise; or

(b) Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or

(c) Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of position; or

(d) Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

Courts have "set a high threshold for outrage claims," *id.*, and under Kentucky law, "a claim for the tort of outrage requires the plaintiff to prove conduct which is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Seitz*, 796 S.W.2d at 3 (quoting Restatement (Second) of Torts § 46(1) cmt. d (1965)). For example, Kentucky courts have found nothing to support a claim of outrage where the defendant:

> (1) refused to pay medical expenses arising out of an injured worker's compensation claim; (2) wrongfully converted the plaintiff's property in a manner that breached the peace; (3) negligently allowed his vehicle to leave the road and struck and killed a child; (4) committed "reprehensible" fraud during divorce proceedings by converting funds belonging to his spouse for the benefit of defendant and his adulterous partner; (5) wrongfully terminated the plaintiff; (6) displayed a lack of compassion, patience, and taste by ordering plaintiff, who was hysterical over the fact that she had just delivered a stillborn child in her hospital room, to "shut up" and then informing her that the stillborn child would be "disposed of in the hospital"; (7) erected a billboard referencing defendant's status as a convicted child molester; (8) wrongfully garnished plaintiff's wages pursuant to a forged agreement; and (9) impregnated plaintiff's wife.

*Stringer*, 151 S.W.3d at 790-91 (internal citations omitted).

"It is for the court to decide whether the conduct complained of can reasonably be regarded to be so extreme and outrageous as to permit recovery." *Goebel v. Arnett*, 259 S.W.3d 489, 493 (Ky. Ct. App. 2007) (citing *Whittington v. Whittington*, 766 S.W.2d 73 (Ky. Ct. App. 1989)). The Court looks to "'the conduct of the offender rather than the subject of the conduct.'" *Stringer*, 151 S.W.3d at 788 (quoting *Burgess v. Taylor*, 44 S.W.3d 806, 809 (Ky. Ct. App. 2001)).

Graham does not describe the facts necessary to allow this claim of outrage to continue. Though some defendants' behavior here is certainly reproachful, it does not satisfy the high bar for outrage established by Kentucky courts. Thus, Defendants are entitled to summary judgment on Graham's outrage claim.

## VIII.   <u>Count VIII: Defamation</u>

Graham asserts defamation claims against Hopkinsville Police Chief Guy Howie and Sheriff Livy Leavell for statements they made to a local newspaper following Graham's termination. Howie argues, and Graham concedes, that Graham's claim against him for his December 29, 2010, statement is barred by the relevant statute of limitations. *See* Ky. Rev. Stat. § 413.140(1)(d). Thus, the Court only need evaluate Graham's claim against Sheriff Leavell.

In Kentucky, in order to state a claim for defamation, a plaintiff must show that: 1) a defamatory statement was made; 2) of or concerning the plaintiff; 3) which was published to a third party; and 4) which caused injury to the plaintiff's reputation. *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981). A defamatory statement is measured by looking at the publication as a whole to gauge the effect on the average reader. *Ashby v. Hustler, Magazine, Inc.*, 802 F.2d 856, 858 (6th Cir. 1986). Harm to one's reputation is presumed if the publication is defamatory per se, meaning "the words in their essence must tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society." *Courier Journal v. Noble*, 65 S.W.2d 703 (Ky. 1933); *Columbia Sussex Corp.*, 627 S.W.2d at 274; *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995). However, "written or printed publications, which are false and tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame, are libelous per se." *Courier Journal* at 703. In the absence of defamation per se and libel per se, the party must prove injury through extrinsic facts or explicatory circumstances. David A. Elder, Kentucky Tort Law: Defamation and the Right of Privacy, § 1.06 at 37 (1983).

Graham takes issue with Sheriff Leavell's March 7, 2012, statement to a local newspaper that Graham was "terminated with cause for creating a hostile environment" and that "Graham's claims that he ignored her reports of policy violations were an absolute lie." (DN 36-9.) Through her response affidavit, Graham says she was "embarrassed and felt attached [sic] and vulnerable", but does not note any other effects of Leavell's statement. (DN 52-5.) Leavell argues that his statements, made in response to a local newspaper's inquiry regarding a lawsuit in which he was named as a defendant, are privileged. Kentucky law recognizes the Restatement (Second) of Torts § 594, which provides that:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important interest of the publisher, and
> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

*See* 13 Ky. Prac. Tort Law § 15:14 (quoting § 594). As the Tenth Circuit has noted, "[t]he principle set out in § 594 simply means that one whose reputation is under attack has the right to defend himself." *Lee v. Calhoun*, 948 F.2d 1162, 1166 (10th Cir. 1991) (holding that comments were conditionally privileged where the publishing defendant was responding to a reporter's inquiry into the circumstances of claims made in lawsuit pending against him).

Like the defendant in *Lee*, Sheriff Leavell was "entitled to provide information that affected his important interest in his own reputation." *Id.* By placing the circumstances of her termination in controversy, Graham cannot complain when Leavell responds to the allegations against him, especially in light of the abbreviated and vague statement at issue here. *Cf. Hall v. Kan. Comm'n on Veterans Affairs*, 2012 WL 1194331, *5 (D. Kan. Apr. 9, 2012) (holding a defendant's statements about the plaintiff's mental health was conditionally privileged where it was specifically in controversy in the lawsuit pending against the defendant's employer).

24

Because Plaintiff offers no support for her conclusory allegation that Leavell abused the privilege, the Court holds that Sheriff Leavell's statements were privileged, and summary judgment is warranted on Graham's defamation claim.

### IX.     Count X: Malfeasance[10]

Graham concedes that her claim in Count X should be dismissed. Thus, the Defendants are entitled to summary judgment on Graham's malfeasance claim.

### X.      Count XI: Employment Discrimination

Count XI asserts an employment discrimination claim solely against the City of Hopkinsville. Because Graham has voluntarily dismissed the City of Hopkinsville as a defendant, (DN 51), this claim is no longer viable.

### XI.     Count XII: 42 U.S.C. § 1985

Defendants argue that Graham's claim alleging an unlawful conspiracy under 42 U.S.C. § 1985 is subsumed within her Title VII claims. Because Graham concedes this point, the Court finds summary judgment is warranted on this claim as well.

### XII.    Count XIII: Punitive Damages

Because none of Graham's underlying claims have survived summary judgment, she is not entitled to punitive damages.

---

[10] Graham's Amended Complaint does not contain Count IX.

**CONCLUSION**

Defendants have moved for summary judgment on Plaintiff's remaining claims. For the foregoing reasons, Defendants' Motions for Summary Judgment on all remaining causes of action asserted by Plaintiff are GRANTED. An appropriate order shall issue.

CC: Counsel